

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-179-CR

PEDRO ARIEL ZARATE LUCIO                                              APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

### FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Two-year-old D.P. died from injuries she sustained when gang members parked in front of her house and fired into the bedroom where she was sleeping. For his part in the shooting, Appellant Pedro Ariel Zarate Lucio was convicted of murder and engaging in organized criminal activity and sentenced to sixty years' confinement.

---

[1] *See* Tex. R. App. P. 47.4.

In three points on appeal, Appellant claims that the trial court erred by allowing the prosecutor to ask a witness to waive her attorney-client privilege, by admitting evidence Appellant contends is irrelevant, and by commenting on the weight of the evidence in a supplemental jury charge. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant belonged to an Arlington street gang known as the Latin Kings. Sometime around midnight on May 4, 2006, he arrived at a Dallas nightclub with Martin Lozoya, Yesenia Velasquez, and Yesenia's cousin Angelica. Appellant and Martin stayed close to the front of the club—where the Latin Kings were known to congregate—while Yesenia and Angelica continued toward the back.

There, Yesenia confronted sisters Roxanne "Roxy" Espinosa and Pamela Rocha. The women got into a heated argument and security at the club asked all of them to leave.

On the way out, Yesenia worried that Roxy might try to damage her car, so she asked Robert Armendariz and Edgar Rosas to retrieve it from the parking lot for her. As soon as Robert and Edgar left to do so, Yesenia realized that neither one of them knew what her car looked like or where it was parked, so she asked Appellant to go help.

Pamela saw Appellant as he made his way through the parking lot. She approached him with Jesse Prado, a former member of the Latin Knights, a rival

gang. Jesse and Appellant had known each other since childhood and had never liked each other.

Over Jesse's shoulder, Pamela taunted Appellant about a prior conflict involving one of her brothers and one of Appellant's brothers. Appellant took offense and flashed Latin Kings gang signs at Jesse. When Jesse tried to walk away, Appellant followed alongside him, continuing to flash gang signs and "talking trash."

From across the parking lot, Edgar could tell that Appellant and Jesse were not engaged in "a friendly conversation." Dallas Police patrolling the area noticed the commotion and dispersed it. Appellant stalked off, declaring that he would "take care of it later."

Robert and Edgar found Yesenia's Nissan Altima and drove it to her. She, Angelica, and Martin piled into the back seat, as did Appellant when they caught up with him.

Appellant was visibly angry. He "mentioned something about going to get an AK" and started making calls on his cell phone. Robert heard him call "Mapa," a nickname for Victor Aguilar, who is known for carrying guns. He also heard him say into the phone, "I'm going to shoot Jesse's house up," and "[G]et ready." Edgar overheard Appellant say "something about an AK," to "get ready," and that "it's gonna happen tonight."

Angelica rode on Appellant's lap in the cramped backseat. They soon started arguing. Appellant then argued with Yesenia, which resulted in his and Martin's

3

departure from the vehicle at a 7–11 store in Grand Prairie. With Appellant and Martin out of the car, Robert called Jesse and warned him that Appellant had said he was "going to go shoot Jesse's house up." Jesse, who was having a late dinner, headed home.

Yesenia had been on her cell phone complaining to her friend Ely Almendariz about her run-in with Roxy and Pamela. Ely was at her cousin Victor "Mapa" Aguilar's house drinking with Victor and Henry "Elmo" Gabrillo, both Latin Kings. Ely was upset after hearing about the argument and wanted to go confront Roxy with Yesenia when Appellant called, needing a ride. Ely was too intoxicated to drive, so Henry agreed to drive Ely's tan GMC Suburban. Ely rode in the passenger seat, and Victor and his date Alexis Ledesma rode in the backseat. Henry drove to Grand Prairie, where they picked up Appellant and Martin walking along Pioneer Parkway.

After a short drive, Henry stopped the Suburban again and got out. Ely had been passing in and out of consciousness, but she awoke when she heard gunfire and saw Henry running back to the car. He climbed in, set a .40 caliber Glock handgun on the console, and resumed driving. Ely stashed the weapon in her purse on the floorboard.

Jesse had three young children with Christine Arredondo, and Christine was pregnant with their fourth child. D.P. was about one-and-a-half-years old, little brother J.P. was almost one, and older sister A.P was two. The children were in bed in the front bedroom of their house. D.P. and J.P. were sleeping closest to the

4

window that faced the street, and A.P. was sleeping near the wall on the opposite side of the bed. Christine had dozed off next to A.P. while watching television.

That night, the weather turned rough. Severe thunderstorms had rumbled into the Metroplex. Around three in the morning, Christine awoke to what she thought was the sound of thunder or hail hitting the window. She saw J.P. sitting up in the bed screaming, and she noticed a hole in his shirt. She went to hold him and felt blood on his hand. Alarmed, Christine looked out the window and noticed a tan Suburban parked in the street with someone in the seat behind the driver reaching out to close the door. Then Christine noticed that the bedroom's bottom window pane had been shattered.

She carried her son into the living room to look at him under the light. His shoulder had been nicked but he was otherwise unharmed. Christine hurried back to the bedroom, turned the light on, and checked her other children.

The oldest was fine. But D.P. lay underneath a pillow at a different angle from how she had gone to sleep. Christine lifted the pillow and saw a pool of blood on the bed. She screamed, grabbed D.P., ran to the living room, scooped up J.P., and ran with them both across the street for help.

It was raining hard. Christine was seven months pregnant, and when she reached the grass at the curb while carrying her two children, she slipped.

Julian Garza lived across the street. Awakened by the sound of gunfire, he checked on his children and then looked outside. Seeing nothing unusual, he went

back into the house. As he was closing the door, however, he heard Christine screaming. He looked outside again and saw her fall.

Christine had dropped her children. Unable to carry them both at the same time, she passed her son to Julian and then went back for D.P. who lay on the concrete, barely breathing. The neighbor handed J.P. to his wife and then reached for D.P. He carried her to the living room and lay her down on the floor. She was bleeding badly. Julian tried to staunch the blood with a towel. One of his sons called 911. Another family member retrieved Christine's other daughter from across the street.

Arlington Police Officer Anthony Wright responded to the 911 call. When he arrived, he saw D.P. on the living room floor with a severe head injury. Almost immediately, fire department personnel rushed in and transported her to Fort Worth's Cook Children's Hospital.

She arrived in grave condition. The left side of her brain had been severely damaged by a gunshot wound. The bullet was still there, resting in front of her ear. In an attempt to save her life, surgeons removed half of D.P.'s brain. Her prognosis was "terrible." She survived another six months before dying from the injuries caused by the gunshot.

Christine described the Suburban she had seen outside the window to Officer Wright, who immediately broadcast the description to all units in the area. After

6

Jesse arrived and learned that his children had been shot, he reported the earlier altercation and Appellant's threat to shoot up his house.

Officer Heather Boone spotted a tan Suburban that matched the broadcast description. Henry, Ely, and Appellant were still inside the vehicle—the others having been dropped off after the shooting. Henry led officers on a brief chase and then pulled over. One by one, he, Ely, and Appellant were ordered out of the Suburban and taken into custody.

Officers found the Glock in Ely's purse under the front seat. Ely, Henry, and Appellant all tested positive for gunpowder residue. The results of Appellant's test showed that he either had been close to the weapon when it was fired or had handled it afterward. Subsequent analysis of the weapon linked it to expelled cartridge casings found in the street in front of the Prado home. Bullets recovered from the home and the one recovered from D.P. during surgery shared "consistent characteristics" but were not established to a scientific certainty to have all been fired from the weapon found in Ely's purse.

Henry and Appellant denied any involvement in the shooting. Police interviewed Ely twice on the morning of her arrest, and both times she claimed to have been the sole shooter. Her story, however, did not make sense to investigators: she claimed that she had shot at the house because she had become enraged after Yesenia called her and told her about the argument with Roxy.

7

Ely eventually recanted her confession, and after repeated meetings with investigators and prosecutors, she was released from custody and all charges against her were dropped. She testified at a hearing some months before Appellant's trial and then again at his trial.

The trial ran more than two weeks. In the end, the jury acquitted Appellant of the capital murder charge but convicted him of murder and engaging in organized criminal activity. The jury assessed his punishment at sixty years' confinement for each conviction. The trial court sentenced him accordingly, ordering that the sentences run concurrently.

### III. IMPROPER QUESTION

In his first point, Appellant claims that the trial court abused its discretion by allowing the prosecutor to ask Ely to waive her attorney-client privilege.

Ely obtained counsel following her arrest on the morning of the shooting. After some time in jail following her initial confession, she recanted and was "ready to tell the truth." On September 21, 2007, she and her lawyer met with the prosecutor to discuss her testimony for a hearing scheduled four days later. On September 25, 2007, Ely testified under oath that Appellant, Henry Gabrillo, and Victor Aguilar were all members of the Latin Kings gang, that the gun used in the shooting belonged to Victor, that he had suggested disposing of it and had instructed her to call a woman he knew who would help her do so, and that Ely "had a memory" of the passenger door of the Suburban closing immediately after the shooting.

8

Jury selection for Appellant's trial was set for May 6, 2008. Approximately ten days before trial, Ely met with the prosecution at a McDonald's restaurant to once again review her upcoming testimony. On May 8, 2008, Ely was the ninth of eighteen witnesses called by the State in its case in chief. She admitted on the stand that she had been present during the shooting, had concealed the murder weapon in her purse, and had twice falsely confessed to police to having been the shooter before charges against her were dropped.

Ely acknowledged that she had met with the prosecution numerous times to discuss her testimony, including the meeting at McDonald's some ten days or so before trial. During questioning by the State, however, she professed not to remember many of the facts she had previously either discussed with the prosecution or testified to. Moreover, although she admitted that she knew Appellant, Victor Aguilar, Martin Lozoya, and Henry Gabrillo, she claimed to have lied when she testified at the September hearing that they were all members of the Latin Kings.

The trial recessed for lunch between Ely's direct examination by the State and cross examination by the defense. During the break, Ely visited with Appellant's counsel. Afterwards, she testified on cross-examination that she had repeatedly lied to prosecutors, claiming that she had told them "what they wanted to hear" because she was "tired of being in jail," would have said anything to get out, and was afraid that if she changed her story the prosecutor would make it "bad" for her.

9

On the State's redirect, Ely was asked about statements she had made to the prosecution during their meeting at the McDonald's before trial. She denied saying that she knew before the shooting that Appellant and Victor did not like Jesse. She did not remember saying that Appellant was angry when he got in the Suburban or that he had talked about "the fight at the club with Jesse." At first she did not remember telling the prosecution that the gun belonged to Victor but then testified that she had "said it for a reason."

At that point, the prosecutor began the following line of questions that forms the basis of Appellant's first point on appeal:

> Q. Are you willing to waive your attorney/client privilege and allow [your attorney] Mr. Brown to talk to this jury about the things you told him about that on that night?
>
> [DEFENSE COUNSEL]: I'm going to object without her counsel present to explain what he means legally on that matter.
>
> THE COURT: I will overrule the objection.
>
> Q. [PROSECUTOR:] You have a right to prevent him from testifying and telling these people what you said, okay? It's secret. It's secret. Unless you give permission for him to talk to these people, he can't do it.
>
> Are you willing to right now on the record give him permission to talk to these people and tell them what you told him about that night?
>
> A. What do you mean?
>
> Q. I'm sorry?
>
> A. What?

Q. Are you willing right now to give your attorney, Scott Brown, permission to tell these people what you told him about the things that happened that night?

A. No.

Q. You don't want him saying what you told him, right?

[DEFENSE COUNSEL]: I'm going to object again. This is attorney/client privilege that he is inquiring about.

THE COURT: Overruled.

[DEFENSE COUNSEL]: And I ask for a running objection to all questions related to this matter.

THE COURT: All right.

[DEFENSE COUNSEL]: Thank you. Also, Your Honor, I'm asking for a mistrial based on this.

THE COURT: Denied.

Appellant contends that the prosecutor's soliciting Ely's waiver of her attorney-client privilege violates Texas Rule of Evidence 513, which prohibits comments on a claim of privilege before the jury. Specifically, Appellant points to parts (a) and (b) of the rule, which state in pertinent part:

(a) Comment of Inference Not Permitted. . . . the claim of a privilege . . . is not a proper subject of comment by judge or counsel, and no inference may be drawn therefrom.

(b) Claiming Privilege Without Knowledge of Jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

11

Tex. R. Evid. 513. The State argues that Appellant's claim is not preserved for our review.[2]

An appellant's complaint on appeal must comport with the specific objection made at trial. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Simmons v. State*, 288 S.W.3d 72, 77 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). An objection stating one legal theory may not be used to support a different legal theory on appeal. *Broxton*, 909 S.W.2d at 918; *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991); *Simmons*, 288 S.W.3d at 77.

Appellant's first objection to the prosecutor's question does not comport with his theory on appeal. At trial, he objected that Ely should not have been asked whether she would be willing to waive her attorney-client privilege "without her counsel present to explain what he means legally on that matter." On appeal, though, he complains that the trial court's having allowed the question violated rule 513' s proscription against comment before the jury on a claim of privilege, in this instance Ely's attorney-client privilege. The two issues are separate and one has

---

[2] The State does not argue that the prosecutor did not violate rule 513, and in fact, the prosecutor's questioning clearly violated that rule. However, we need not reach the merits of Appellant's argument if he did not properly preserve the complaint for our review. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (noting that a reviewing court will not consider errors, even of constitutional magnitude, not properly preserved).

little if anything to do with the other. The presence of Ely's counsel to explain what the prosecutor means by asking Ely to waive her attorney-client privilege is unrelated to whether asking her in the jury's presence violated rule 513.

A proper objection, one that would comport with this point on appeal, would have alerted the trial court to the fact that the prosecutor was talking about Ely's attorney-client privilege in front of the jury. Indeed, trial counsel later asserted an objection that does comport with his point on appeal when she objected that "[t]his is attorney/client privilege that he is inquiring about."

But because Appellant's first objection does not comport with the complaint on appeal, existing case law requires us to hold that the objection did not preserve Appellant's complaint that the trial court violated rule 513 by allowing the prosecutor to ask Ely if she would waive her attorney-client privilege. *See Broxton*, 909 S.W.2d at 918; *Johnson*, 803 S.W.2d at 292; *Simmons*, 288 S.W.3d at 77.

Although we have noted that Appellant's second objection comports with his point on appeal, by the time counsel articulated it at trial, it was too late to preserve Appellant's complaint. It is well-settled that a timely objection is required in order to preserve a complaint for review. *See* Tex. R. App. P. 33.1(a)(1)(A); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009). A timely objection is one that is made at the first opportunity or as soon as the basis for it becomes apparent. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997); *Polk v. State*, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987).

After the trial court overruled Appellant's first objection to the prosecutor's request for Ely to waive her privilege, the prosecutor explained to Ely that she had a "right to prevent [counsel] from testifying and telling these people [the jury] what you said." He then repeated the question: "Are you willing to right now on the record give him permission to talk to these people and tell them what you told him about that night?" Although this question was objectionable, Appellant stood mute, did not object, and Ely responded to the prosecutor's question by asking, "What do you mean?" The prosecutor replied with "I'm sorry?" to which Ely replied, "What?" The record then shows that the prosecutor repeated the question a third time and that Ely answered it.

Q. Are you willing right now to give your attorney, Scott Brown, permission to tell these people what you told him about the things that happened that night?

A. No.

Finally, after the prosecutor confirmed Ely's answer, Appellant objected.

Q. You don't want him saying what you told him, right?

[DEFENSE COUNSEL]: I'm going to object again. This is attorney/client privilege that he is inquiring about.

THE COURT: Overruled.

By then, however, it was too late to preserve the claim for our review. Appellant's objection was untimely as contemplated by our rules of error preservation because it was not presented until after the prosecutor asked numerous

14

times whether Ely would waive her privilege and even explained the privilege to her. *See* Tex. R. App. P. 33.1(a)(1)(A); *Lagrone*, 942 S.W.2d at 618; *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995); *Johnson*, 803 S.W.2d at 291; *Marini v. State*, 593 S.W.2d 709, 714 (Tex. Crim. App. 1980). We hold, therefore, that Appellant's second objection failed to preserve his complaint for our review.

Because neither of Appellant's objections preserved his claim for our review, we overrule Appellant's first point.

## IV. PRIOR SHOOTING INCIDENT

In his second point, Appellant contends that the trial court abused its discretion by admitting evidence that Appellant had previously been the victim of a shooting.

Arlington Police Department Gang Unit Officer Sean Wheetley testified that, in his opinion, Appellant was a member of the Latin Kings gang. Officer Wheetley also testified that in 2003 he had investigated a shooting in which Appellant was the victim and about which Latin Kings gang members Henry Gabrillo and Appellant's older brother Ishmael Lucio believed "might possibly" have been gang-related. The officer further testified, however, that the investigation had ultimately produced no clear answer on whether that shooting was gang-related or whether it even occurred as originally reported and that he had concluded the investigation without filing charges.

15

Appellant argues that because Officer Wheetley could not determine if the prior shooting had been gang-related, his testimony regarding the investigation was not relevant to the issue of whether the shooting in the instant case was gang-related. But whether or not the officer could determine if the earlier shooting had been gang-related, evidence that Appellant was reportedly shot under suspicious circumstances and that known gang members—including Henry Gabrillo—had believed that the earlier shooting could have been gang related is relevant to the issue of whether the shooting here—involving Appellant and Henry—is gang-related. Although evidence of the earlier shooting does not establish conclusively that the shooting in the instant case was gang-related, it nonetheless provides a "small nudge" toward proving that it was. *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990) (op. on reh'g); *Levario v. State*, 964 S.W.2d 290, 297 (Tex. App.—El Paso 1997, no pet.); *see Hawkins v. State*, 871 S.W.2d 539, 541–42 (Tex. App.—Fort Worth 1994, no pet.); *see also* Tex. R. Evid. 401 (defining "[r]elevant evidence" as evidence having *any* tendency to make the existence of any fact of consequence more probable or less probable). That is all that is required. *See Montgomery*, 810 S.W.2d at 376; 1 Steven Goode, et. al., *Texas Practice: Guide to the Texas Rules of Evidence* § 401.3 (3d ed. 2002)("If evidence alters the probabilities involved in any degree, it is relevant."). We hold, therefore, that the trial court acted within its wide discretion by admitting Officer Wheetley's testimony about the prior shooting, and we overrule Appellant's second point. *See Carrasco*

16

*v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Montgomery*, 810 S.W.2d at 379.

## V. RESPONSE TO JURY NOTE DURING PUNISHMENT DELIBERATIONS

In his third and final point, Appellant asserts that the trial court erred by administering an unnecessary supplemental jury instruction at punishment that amounted to a comment on the weight of the evidence.

During its deliberations on punishment, the jury sent out the following note:

> Does the law prevent a family member from speaking during the sentencing phase for the defendant?

Over Appellant's objection, the trial court responded with the following instruction:

> The law does not prohibit a family member from testifying on behalf of a defendant so long as the witness has relevant evidence related to the issues in the case. You have heard all of the witnesses who have been called to testify. Please continue your deliberations.

It is well settled that although a jury is the exclusive judge of the facts, it is bound to receive the law from the court and to be governed by such law. *Abnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *Chance v. State*, 292 S.W.3d 138, 141 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *see* Tex. Code Crim Proc. Ann. art 36.13 (Vernon 2007). In giving its charge and in responding to questions from the jury, the trial court may not comment on the weight of the evidence. *Whaley v. State,* 717 S.W.2d 26, 32 (Tex. Crim. App. 1986); *Grady v. State*, 634 S.W.2d 316, 317 (Tex. Crim. App. 1982); *Davis v. State,* 955 S.W.2d 340,

17

351 (Tex. App.—Fort Worth 1997, pet. ref'd); *see* Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007).  But a trial court may respond to a jury note with a legally correct statement of the law.  *See, e.g.*, *Krause v. State*, 243 S.W.3d 95, 108 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Ryan v. State*, No. 06-07-00081-CR, 2007 WL 4118296, at *2 (Tex. App.—Texarkana Nov. 21, 2007, pet. ref'd) (mem. op., not designated for publication) (holding that a trial court's accurate statement of law in response to a jury question was not grounds for reversal).

Here, we hold that the trial court's response to the jury note was a correct statement of the law.  *Compare Chance v. State*, 292 S.W.3d 138, 141–42 (Tex. App.—Houston [14 Dist.] 2008, pet. ref'd) (holding trial court's response to jury's question properly clarified question of law); *Kuhn v. State*, No. 2-07-00157-CR, 2008 WL 344516, at *4 (Tex. App.—Fort Worth Feb. 7, 2008, no pet.) (mem. op., not designated for publication) (same), *with Matamoros v. State*, 901 S.W.2d 470, 477 (Tex. Crim. App. 1995) (holding instruction about reliability of DNA evidence is impermissible comment on weight of evidence); *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993) (holding instruction about available correction facilities for defendant was erroneous instruction about a factual, rather than legal, matter). The trial court's response expressed no opinion as to the weight of the evidence, nor did it assume the existence of a disputed fact.  *See Whaley*, 717 S.W.2d at 32; *Davis v. State*, 955 S.W.2d 340, 351 (Tex. App.—Fort Worth 1997, pet. ref'd).

18

Because the trial court did not err in its response to the jury's note, we overrule Appellant's third point.

## VI. CONCLUSION

Having overruled all of Appellant's points, we affirm the judgment.

PER CURIAM

PANEL: WALKER,J.; LIVINGSTON, C.J.; and MEIER, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 29, 2010

19